ORDERED.

**Dated:  June 26, 2015**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 8:13-bk-08406-MGW
                                                          Chapter 11
Ronald William DeMasi
and Susan J. DeMasi,

      Debtors.
_____/

Ravi Kondapalli, M.D., individually, and          Adv. No. 8:13-ap-00889-MGW
Ravi Kondapalli, M.D., by and on behalf
of Gulf Coast Digestive Health Center, PL,

      Plaintiffs,
v.

Ronald William DeMasi,

      Defendant.
_____/

## AMENDED MEMORANDUM OPINION AND
## ORDER ON MOTION FOR SUMMARY JUDGMENT

      Pursuant to the Order Granting Debtor's Motion for Reconsideration of Memorandum

Opinion and Order on Motion for Summary Judgment (Doc. No. 65), the Court hereby enters

this Amended Memorandum Opinion and Order on Motion for Summary Judgment, which

amends and restates in its entirety the Memorandum Opinion and Order on Motion for Summary

Judgment (Doc. No. 56) as follows:

Bankruptcy Code § 523(a)(2)(A) provides that a discharge under the Bankruptcy Code

does not discharge a debtor from liability for money, property, services, or credit obtained by

fraud. In December 2012, a Florida state court determined that Dr. Ronald DeMasi, one of the

Debtors in this case, was liable for defrauding Gulf Coast Digestive Health Center, PL ("State

Court Judgment"). Dr. DeMasi has since filed for bankruptcy, and Dr. Ravi Kondapalli, by and

on behalf of Gulf Coast Digestive Health Center, PL ("Plaintiff"), now seeks a determination that

Dr. DeMasi's state court liability is nondischargeable as a matter of law. Because the State Court

Judgment evidences that all elements of § 523(a)(2)(A) are satisfied, it is entitled to collateral

estoppel effect. Accordingly, summary judgment will be granted in favor of the Plaintiff on his

claim under § 523(a)(2).

### **Factual Background**[1]

In 1999, Gulf Coast Endoscopy Center of Venice, LLC ("GCEC") was formed for the

purpose of building an ambulatory surgery center. The members of that entity included Dr.

DeMasi and Dr. Kondapalli.[2] Surgical Synergies, Inc. ("SSI") provides development and

management services (including billing and collection) to ambulatory surgery centers.[3] In

---

[1] The facts set forth herein are taken from the Findings of Fact made by the Hon. Nancy Donnellan, Circuit Judge, ("State Court") in the Amended Final Judgment entered on December 7, 2012, in the state court case styled *Ravi Kondapalli, M.D., et al., v. Ronald W. DeMasi, M.D.*, Case No. 2010-CA-9386-NC, pending in the Circuit Court of the 12th Judicial Circuit, in and for Sarasota County, Florida ("State Court Judgment"). The State Court Judgment can be found at Doc. No. 1-1.

[2] *Id.* at ¶ 2.

[3] *Id.* at ¶ 3.

February 2000, GCEC and SSI entered into a management agreement under which SSI provided management services for the surgery center.[4]

An audit of SSI's performance in 2003 revealed serious concerns about discrepancies between SSI billing reports and the actual numbers. SSI was put on notice that if its performance did not improve, then GCEC intended on terminating the management agreement.[5] Another audit was conducted in 2004. It was also very unfavorable to SSI.[6] But none of the members of GCEC, other than Dr. DeMasi, received a copy of the second audit. And with knowledge that the second audit was unfavorable, Dr. DeMasi remained silent at a meeting of the members when SSI affirmatively represented that the audit report was favorable.[7] In fact, Dr. DeMasi never disclosed the fact that the audit was unfavorable to GCEC's other members.[8] According to the State Court, "[T]hese facts reveal a disturbing pattern of deceit and misrepresentation."[9]

In January 2005, Dr. DeMasi wrote a letter to the chief executive officer of SSI expressing excitement and interest in working with SSI, as a joint venture partner, to develop and manage endoscopy surgery centers.[10] The entity that would be formed was an endoscopy entity within SSI to be called Surgical Synergies Endoscopy, LLC ("SSE"). Dr. DeMasi had a financial interest or an interest in the form of the opportunity to receive either cash payment for the successful referral to SSI/SSE or the ability to obtain an equity position in a completed surgery

---

[4] *Id.* at ¶ 5.

[5] *Id.* at ¶ 8.

[6] *Id.* at ¶ 10.

[7] *Id.* at ¶¶ 12-13.

[8] *Id.* at ¶ 14.

[9] *Id.*

[10] *Id.* at ¶ 16.

center should a deal have closed. Dr. DeMasi described his financial interest in SSE "as either taking stocks in SSE or an equity interest in the centers developed or acquired by SSE or both."[11]

There were various descriptions of Dr. DeMasi's interests in either SSI or SSE. Dr. DeMasi's financial interest was described by an officer of SSI at trial as "being fluid and dependent on the size of the deal that Dr. DeMasi helped to close and could range from a monetary finder's fee to an equity position in the new project."[12] An employee of SSE described Dr. DeMasi's financial interest as some form of a partnership. Her general understanding was that Dr. DeMasi would have some ownership interest in either SSI or SSE or some entity formed for the purposes of establishing a center.[13] Another employee testified that Dr. DeMasi had the potential to be a shareholder in a company that developed endoscopy centers.[14] An officer of SSI admitted that SSI offered Dr. DeMasi a financial interest both in the form of a finder's fee and equity participation in order to incentivize Dr. DeMasi.[15]

From the date SSE was formed in January 2005, Dr. DeMasi took multiple steps to conceal his true relationship with SSI/SSE from his fellow members at GCEC.[16] In fact, there was an agreement between Dr. DeMasi and various employees of SSI that "mum's the word" regarding his involvement in the development of SSE.[17] As found by the State Court, "Dr. DeMasi consistently denied and misrepresented his level of involvement and his financial

---

[11] *Id.* at ¶ 19.

[12] *Id.* at ¶ 20.

[13] *Id.* at ¶ 21.

[14] *Id.* at ¶ 22.

[15] *Id.* at ¶ 23.

[16] *Id.* at ¶ 24.

[17] *Id.* at ¶ 25.

interest or interest in SSE to his fellow members of GCEC [and a related entity], Gulf Coast Digestive. On at least three occasions when confronted by his fellow members with questions regarding his involvement and financial interest in SSI/SSE, Dr. DeMasi denied both."[18]

Sometime during the second half of 2005, Dr. DeMasi and principals from SSI approached Dr. Kondapalli and two other GCEC physicians, Dr. Howard Grossbard and Dr. Peter Dumas, about the possibility of opening a new medical practice.[19] Dr. DeMasi presented a pro forma, which showed the other physicians that together they could achieve an economy of scale that would enable each one of them to earn greater income. After several meetings over the following months, the physicians agreed to the plan, and they collectively created a new medical practice in July 2006—the Plaintiff, Gulf Coast Digestive Health Center, PL.[20]

In September 2006, one of the doctors at GCEC discovered a website maintained by SSE. It showed Dr. DeMasi as president of the company. A meeting was called, and Dr. DeMasi was confronted with a printout of the website. As found by the State Court, "Dr. DeMasi denied having ever seen the website; that he had no knowledge of his defined role with SSE, and that this was the first time he saw that SSE had publicly represented him as its President."[21] Contrary to this representation, Dr. DeMasi had, in fact, prepared logos, brochures, PowerPoint presentations, and business cards, all of which referred to him as president of SSE and identified the website for SSE, which also listed him as president.[22] As the State Court found, "For Dr. DeMasi to deny he had a financial interest or an interest in SSI/SSE in September 10, 2006,

---

[18] *Id.* at ¶ 27.

[19] *Id.* at ¶ 44.

[20] *Id.* at ¶¶ 44-45.

[21] *Id.* at ¶ 28.

[22] *Id.* at ¶ 30.

when confronted with the SSE website, was a deliberate misstatement of fact designed to mislead his partners."[23]

Dr. DeMasi's second denial came in 2007 when Dr. Dumas resigned from Gulf Coast Digestive following a volatile Board of Managers meeting at which Dr. Dumas expressed his desire to terminate SSI for their obvious poor performance. Dr. DeMasi became so enraged at the suggestion that he threw a metal object at Dr. Dumas, cursed him, and told him to quit and leave. Dr. Dumas resigned the very next day.[24]

Thereafter, Gulf Coast Digestive and Dr. Dumas entered into a Settlement Agreement and Release. As a condition of his executing the Settlement Agreement and Release, Dr. Dumas required Dr. DeMasi to make a representation in the agreement as follows:

> 7.    Dr. DeMasi Representation. Dr. DeMasi represents and warrants that he has not had and does not new (sic) have any financial or other interest, direct or indirect, in Surgical Synergies, Inc. . . . And further warrants that he has not had does not now have any relationship with SSI's principal . . . through which Dr. DeMasi or anyone on his behalf receives any benefits, financial or otherwise, other than that which has been expressly disclosed to the Other Member Physicians in writing.[25]

The State Court also found that a "second critical misrepresentation" came in the fall of 2007.[26] By that time, the auditors had found that SSI was deficient in its billing and collection practices. At that time, Dr. DeMasi made a "misrepresentation of a material fact" when he told Dr. Kondapalli that the chief executive officer of SSI would sue Gulf Coast Digestive if their contract was terminated and that such a suit would potentially cost Gulf Coast Digestive

---

[23] *Id.* at ¶ 34.

[24] *Id.* at ¶ 35.

[25] *Id.* at ¶ 35.

[26] *Id.* at ¶ 117.

"hundreds of thousands of dollars." The chief executive officer of SSI testified that he never

made such a statement to Dr. DeMasi. Based on that testimony, the State Court found that "Dr.

DeMasi knew such representation was false at the time it was made and such representation was

clearly meant to influence" Dr. Kondapalli.[27]

The State Court found that "Dr. DeMasi had a financial interest or other interest in

SSI/SSE as early [as] 2005" and that "Dr. DeMasi's denial of a financial interest or other interest

in SSI/SSE when confronted by his fellow members constitutes a misrepresentation of a material

fact." The State Court further noted that Dr. DeMasi continued "this pattern of misrepresenting

his financial interest or other interest in SSI/SSE through the early course of his deposition, prior

to being shown documents which conclusively refuted his representations."[28] "The overall

picture developed at trial through the testimony and exhibits shows an elaborate scheme to cover

up . . . Dr. DeMasi's considerable efforts to develop SSE for [his] own benefit."[29]

The State Court's findings and conclusions with respect to Dr. DeMasi's

misrepresentations are summarized as follows:

> [T]his Court finds that but for Dr. DeMasi's consistent misrepresentation of his
> true financial interest or other interest in SSI/SSE, then SSI would not have been
> in a position to cause damage to Gulf Coast Digestive; or at the very least such
> damage would have been minimized by an earlier termination or mitigated by a
> direct lawsuit against SSI.[30] Moreover, it is clear that the hiring of SSI to serve as
> the management company of Gulf Coast Digestive was Dr. DeMasi's selfish
> pecuniary motives.[31] [T]his Court finds as a matter of fact that but for Dr.

---

[27] *Id.* at ¶ 117.

[28] *Id.* at ¶ 39.

[29] *Id.* at ¶ 42.

[30] *Id.* at ¶ 66.

[31] *Id.* at ¶ 67.

DeMasi's actions in misrepresenting and failing to disclose his financial interest in SSI/SSE that Gulf Coast Digestive would not have suffered the harm alleged.[32]

As to Dr. DeMasi's defense that he had no financial interest in SSI/SSE, the State Court rejected that argument, finding as follows: "Dr. DeMasi asserts that because he never successfully referred a potential client to SSI/SSE and therefore no deal was ever closed in which he received either monetary compensation or the ability to participate in the equity portion of the deal, that he did not have a financial interest in SSI/SSE. This Court rejects this argument."[33] The State Court continued, "Black's Law Dictionary defines 'interest' as 'the object of any human desire; esp., advantage or profit of a financial nature.'"[34] "By either definition and based upon the record evidence, Dr. DeMasi had both the financial interest and an interest in SSI/SSE."[35]

In summary, with respect to the fraud count of the state court action, the State Court concluded that the Plaintiff had established the essential elements of a fraud claim under Florida law, specifically: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the interpretation. Fraud also includes the intentional omission of a material fact.[36]

## Conclusions of Law

The Plaintiff argues that it is entitled to summary judgment on its § 523(a)(2)(A) claim because the State Court Judgment establishes that Dr. DeMasi obtained money, property, or

---

[32] *Id.* at ¶ 91.

[33] *Id.* at ¶ 76.

[34] *Id.* at ¶ 70.

[35] *Id.* at ¶¶ 76-79.

[36] *Id.* at ¶ 113 (citing *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (3d DCA 2001)).

services through fraud. The Plaintiff further argues that Dr. DeMasi is collaterally estopped from relitigating this matter in federal court.

Dr. DeMasi, on the other hand, claims just the opposite. He suggests that the State Court Judgment establishes that he *did not* receive any benefit from his actions and that the Plaintiff's claim against him does not fall within § 523(a)(2)(A) and, therefore, is a dischargeable debt. Dr. DeMasi also argues that whatever the State Court Judgment establishes is immaterial because it is not entitled to any preclusive effect under Florida law. Accordingly, Dr. DeMasi suggests, he is entitled to summary judgment.

With certainty, the State Court Judgment establishes that Dr. DeMasi did in fact gain a benefit from his fraudulent activities—precisely the conduct that § 523(a)(2)(A) aims to combat. And because each element of Florida's collateral estoppel doctrine is satisfied, this Court must give full faith and credit to the State Court Judgment. As a result, Dr. DeMasi's liability for fraud is nondischargeable, and the Plaintiff is therefore entitled to summary judgment.

A. <u>The State Court Judgment is entitled to preclusive (collateral estoppel) effect and full faith and credit</u>

In *Brown v. Felson*,[37] the Supreme Court ruled that the doctrine of res judicata is inapplicable to dischargeability actions. The Court did not, however, consider "the narrower principal of collateral estoppel."[38] While res judicata precludes litigation of all that might have been litigated previously, "collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit."[39] So if in the course of resolving a state-law question, a state

---

[37] *Brown v. Felsen*, 442 U.S. 127, 132 (1979).

[38] *Id.* at 139 n.10.

[39] *Id.* (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979); *Cromwell v. Cnty. of Sac*, 94 U.S. 351, 352-353 (1877).

court should determine factual issues using standards identical to those of § 523, then collateral estoppel bars relitigation of those issues in the bankruptcy court.[40]

Moreover, the Full Faith and Credit Act[41] directs federal courts to accord state court judgments the same preclusive effect that they would receive in the state in which the judgment was rendered.[42] The first question, then, for a federal court to address in determining whether relitigation is appropriate is whether or not the claim would be precluded under state law.[43] Florida's collateral estoppel doctrine forecloses relitigation if: "(1) the parties are identical with those from the prior case, (2) the issues are identical, (3) there was a full and fair opportunity to litigate the issues and they were actually litigated, and (4) those issues were necessary to the prior adjudication."[44] For estoppel purposes, the finality of the State Court Judgment is not affected by the pendency of the state court appeals.[45]

In this case, while the Plaintiff points out that the state court litigation satisfies all of the above elements, Dr. DeMasi argues that collateral estoppel does not apply for two reasons:  (1) the matter was not "actually litigated," and (2) the finding of fraud was not "critical and necessary" to the state court's final judgment.

---

[40] *Brown*, 442 U.S. at 139 n.10; *see also Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991) ("Our prior cases have suggested, but have not formally held, that the principles of collateral estoppel apply in bankruptcy proceedings under the current Bankruptcy Code. We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).") (internal citations omitted).

[41] 28 U.S.C. § 1738 ("Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

[42] *Johnson v. Keene (In re Keene)*, 135 B.R. 162, 165-166 (Bankr. S.D. Fla. 1991) (citing *Marrese v. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 381 (1985)).

[43] *Allen v. McCurry*, 449 U.S. 90, 96 (1980).

[44] *Agripost, LLC v. Miami-Dade Cnty.*, 525 F.3d 1049, 1055 (11th Cir. 2008).

[45] *Reese v. Damato*, 44 Fla. 692, 698-699 (Fla. 1902).

Dr. DeMasi bases his first argument—that the matter was not "actually litigated"—on the contention that the State Court did not address the "receipt of benefits" test."[46] This argument fails completely, and for many reasons. Right off the bat, it should come as no surprise that the State Court did not expressly address the "receipt of benefits" test because it is purely a question of federal law. The decision of whether factual findings are sufficient to satisfy § 523(a)(2)(A) is one that should always be "made by the bankruptcy court in the exercise of its exclusive jurisdiction to determine dischargeability."[47] Dr. DeMasi himself admitted that Florida law does not require a tortfeasor to have benefitted from his behavior to be held liable for fraud.[48] Thus, the argument goes that since the State Court did not address something that it had no reason to address, its judgment is deserving of no credit in federal court. That argument is a nonstarter.

To begin with, in the state court, the parties completed a trial on the merits at the conclusion of which the State Court made comprehensive and thorough findings of fraud under Florida common law. In *In re St. Laurent*,[49] the Eleventh Circuit explained that fraud under Florida law and the requirements of § 523(a)(2)(A) are so closely mirrored that they are "sufficiently identical" for collateral estoppel purposes.[50] Relitigating Dr. DeMasi's liability

---

[46] *See HSSM #7 Ltd. P'ship v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 890 (11th Cir. 1996) (adopting the "receipt of benefits" test for § 523(a)(2)(A) cases, which "requires that the debtor gain a *benefit* from the money that was obtained by fraudulent means") (emphasis in original).

[47] *Halpern v. First Ga. Bank (In re Halpern)*, 810 F.2d 1061, 1064 (11th Cir. 1987); *Spires v. Gregg (In re Gregg)*, 268 B.R. 295, 299 (Bankr. N.D. Fla. 2001).

[48] Adv. Doc. No. 49, para. 18.

[49] *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672 (11th Cir. 1993).

[50] *Id.* at 676 (citing *Cardinal Serv. Corp. of Richmond v. Jolly (In re Jolly)*, 124 B.R. 365, 367 (Bankr. M.D. Fla. 1991)) (internal quotations omitted).

"would be to permit the party who loses at . . . trial to have a second day in court on the same issue he and his opponent were fully heard previously."[51] That we cannot do.

Dr. DeMasi's second argument—that the finding of fraud was not "critical and necessary" to the final judgment—similarly lacks merit. The State Court found for the Plaintiff on five of its six claims against Dr. DeMasi. And in awarding damages, the State Court explained that the Plaintiff shall recover "$411,428.93 as the damages proven for Counts I through V."[52] Now, Dr. DeMasi seeks to turn this detrimental damages award in his favor, arguing that the State Court failed to make clear whether its finding of fraud was "critical and necessary" to the final judgment.

In essence, Dr. DeMasi argues that when the same set of facts gives rise to various theories of liability, collateral estoppel cannot apply. This argument is unsound. To illustrate, take the following hypothetical: a company contracts with a security officer to guard its office. If the security officer later becomes disenchanted with, for example, his working conditions, and burns the office to the ground, he would be liable to the company for breach of contract and for the willful and malicious act of arson. That the same set of facts (the security officer exacting revenge by setting the office on fire) gives rise to both claims of relief—one a dischargeable breach of contract claim and the other a nondischargeable claim for willful and malicious injury to the property of another—does not make the findings of either claim any less "critical and necessary" to the final judgment.

In addition to finding that Dr. DeMasi defrauded the Plaintiff, the State Court found that Dr. DeMasi breached his duties of loyalty (not disclosing his relationship with SSI, urging

---

[51] *Henson v. Garner*, 1988 WL 96171, at *3 (W.D. Mo. Feb. 29, 1988) *rev'd sub nom*; *In re Garner*, 881 F.2d 579 (8th Cir. 1989) *rev'd sub nom; Grogan v. Garner*, 498 U.S. 279.

[52] Doc. No. 1-2 at ¶ 3.

Plaintiff to hire SSI, concealing SSI's deficiencies),[53] care (violating his fiduciary duties to maintain a relationship with SSI),[54] and good faith (entering into agreements with SSI while knowing that it performed substandard work, concealing SSI's inadequacies, threatening to terminate Plaintiff's officer administrator for speaking poorly of SSI, fabricating the threat of litigation with SSI[55] and that he breached the SSI and Plaintiff operating agreement (breaching his duties of loyalty and care).[56] But these additional claims do not reduce the significance of Dr. DeMasi's fraud. Indeed, the State Court's judgment clearly shows that the facts that support these additional claims are the same facts that support the finding of fraud—just as the same facts support the two claims in the example above.

Dr. DeMasi's selective reading ignores the certainty that the State Court established over thirty-eight pages of factual findings: "[B]ut for Dr. DeMasi's consistent misrepresentation of his true financial interest or other interest in SSI/SSE . . . SSI would not have been in a position to cause damage to Gulf Coast Digestive."[57] The State Court hardly could have been more clear in explaining just how essential its finding of Dr. DeMasi's fraud was to its ultimate decision.[58]

---

[53] State Court Judgment at ¶ 72.

[54] *Id.* at ¶ 99.

[55] *Id.* at ¶ 105.

[56] *Id.* at ¶ 111.

[57] *Id.* at ¶ 66.

[58] In *Belmont Wine Exchange, LLC v. Nascarella (In re Nascarella)*, 492 B.R. 327, 333 n.44 (Bankr. M.D. Fla. 2013), this Court explained that when a state court complaint contains multiple causes of action, but the "final judgment awards only a single monetary amount without designating the cause of action that the award relates to or specifying a basis for the award, it cannot be known whether any particular cause of action was 'essential' to the final judgment." The present case is easily distinguishable. In unambiguous terms, the state court explained in great detail the exact the basis for the damages award.

B.   The Plaintiff's debt is nondischargeable under § 523(a)(2)

    1.   Receipt of benefits is required

The Bankruptcy Code disallows bad actors "the opportunity for a completely unencumbered new beginning" by excepting certain debts from discharge.[59] Section 523(a)(2)(A) denies a debtor relief from "any debt . . . for money, property, services, or . . . credit, to the extent obtained by false pretenses, a false representation, or actual fraud." This restriction evidences Congress' conclusion that a creditor's "interest in recovering full payment of debts" at times outweighs the debtor's "interest in a complete fresh start."[60]

In *In re Bilzerian*, the Eleventh Circuit explained the full reach of § 523(a)(2)(A).[61] Confronted with an issue of first impression, the court considered whether a debtor must personally receive money from his fraudulent conduct before § 523(a)(2)(A) kicks in.[62] While courts must construe exceptions to discharge narrowly, the court explained, "granting a debtor a discharge based solely on the fact that he or she did not *directly* receive a benefit places a limitation on § 523 that is not apparent from the text of the provision itself."[63] Agreeing with the other three courts of appeals that had previously addressed the issue, the Eleventh Circuit concluded that the "receipt of benefits" test is the proper way to measure application of § 523(a)(2)(A).[64] Under this test, a debtor is denied a complete discharge whenever he or she gains

---

[59] *Grogan v. Garner*, 498 U.S. 279, 286-287 (1991) (internal quotations and citations omitted).

[60] *Id.* at 287.

[61] *HSSM #7 Ltd. P'ship v. Bilzerian (In re Bilzerian)*, 100 F.3d 886 (11th Cir. 1996).

[62] *Id.* at 890.

[63] *Id.* at 891 (emphasis in original).

[64] *Id.* at 890.

"a *benefit* from the money that was obtained by fraudulent means."[65] This benefit can either be direct or indirect.

Here, the Plaintiff argues that the Supreme Court's decision in *Cohen v. de la Cruz*[66] illustrates that § 523(a)(2)(A)'s reach is far broader than the "receipt of benefits" test suggests. Section 523(a)(2)(A), the Plaintiff claims, applies whenever a creditor suffers harm flowing from the debtor's fraudulent activity; the debtor need not show that the creditor obtained anything at all. In this one regard, the Plaintiff misses the mark.

In *Cohen*, the Court considered whether § 523(a)(2)(A) prevents discharge of all liability arising from a debtor's fraud that is assessed as a matter of state law, such as treble damages and attorney's fees and costs.[67] In rejecting the debtor's argument for a narrow construction of § 523(a)(2)(A) that would have limited recovery only to the actual "money, property, services . . . [or] credit" that the debtor fraudulently obtained, the Court explained that "debt for"—when used throughout § 523—is used "to mean 'debt as a result of,' 'debt with respect to,' 'debt by reason of,' and the like ."[68] Accordingly, when § 523(a)(2)(A) is "construed in the context of the statute as a whole," the Court explained, "§ 523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc., including an

---

[65] *Id.* at 890 (emphasis in original).

[66] *Cohen v. de la Cruz*, 523 U.S. 213 (1998).

[67] 523 U.S. at 215.

[68] *Id.* at 220 (citing American Heritage Dictionary 709 (3d ed. 1992); Black's Law Dictionary 644 (6th ed. 1990) ("connoting broadly any liability arising from the specified object")).

award of treble damages for the fraud."[69] Contrary to the Plaintiff's claim, *Cohen* in no way abrogates the "receipt of benefits" test.

But Dr. DeMasi is wrong when he argues that whatever the standard, he cannot be denied a complete discharge because he received *nothing* of value from his fraudulent activity. "[T]he record is devoid of any evidence," he claims, to show that he "gained a benefit as a result of his failure to adequately disclose his role[s]" in SSI and SSE. This is hardly so.

    2.   <u>Dr. DeMasi received a benefit from the fraudulent activity</u>

    (a)   <u>The use of Kim Albert's services was a benefit to SSE and Dr. DeMasi</u>

While it is true that Dr. DeMasi failed to develop even one surgery center for SSE, it was not for lack of effort. For years, Dr. DeMasi spent considerable time to develop his personal interest in growing SSE, often at the expense of the Plaintiff and its physicians. And for good reason. Dr. DeMasi's financial health was directly tied to SSE and SSI. But he did not go at it alone. From the beginning, Kim Albert, GCEC's office manager and Dr. DeMasi's subordinate, dedicated herself to growing SSE's business, expending a considerable amount of GCEC resources throughout. Like Dr. DeMasi, Ms. Albert solicited business and actively marketed SSE's services throughout the country from 2005 through 2008. Like Dr. DeMasi, Ms. Albert herself was financially invested in SSE and held herself out as an officer of the company. All the while, Ms. Albert was exclusively an employee of GCEC.

Dr. DeMasi was keenly aware of the details of this arrangement, but he never once disclosed any of it to the other GCEC physicians. And why would he? He stood only to gain from the relationship: Ms. Albert was committed to developing new leads for SSE while she was

---

[69] *Cohen*, 523 U.S. at 220-221; *see also USAA Cas. Ins. Co. v. Auffant (In re Auffant)*, 268 B.R. 689, 695 (Bankr. M.D. Fla. 2001) (Williamson, J.) (explaining that *Cohen* holds that "not only is the underlying claim for money or property fraudulently taken by the debtor nondischargeable but also other amounts allowable under state law.").

wholly on GCEC's payroll. No matter the value of Ms. Albert's cost-free labor, it was nothing less than a direct benefit to SSE and Dr. DeMasi.

(b) <u>The $100,000 payment to SSI was a benefit to Dr. DeMasi</u>

The structure of the Plaintiff's payment of its management fee to SSI also evidences a benefit to Dr. DeMasi. When Drs. Kondapalli, Grossbard, and Dumas first agreed to form Gulf Coast Digestive (due exclusively to maneuvering by Dr. DeMasi and SSI), SSI agreed that Gulf Coast Digestive would pay the $100,000 management fee out of the first $100,000 in net revenue. Nevertheless, without Gulf Coast Digestive having earned a dime and without explanation to the other Gulf Coast Digestive physicians, Dr. DeMasi paid SSI in full, nine days after Gulf Coast Digestive signed on with SSI. His reason to do so is now of course quite clear: Dr. DeMasi and SSI had a common goal. Together, they planned to develop and manage endoscopy surgery centers, all under SSE's name. Any benefit to SSI was therefore of some benefit to Dr. DeMasi.

In deciding *In re Bilzerian*, the Eleventh Circuit relied on the Ninth Circuit's decision in *In re Ashley*,[70] which presents a situation very similar to this one. In *In re Ashley*, the creditors, Helen and Eugene Church, first encountered the debtor, Robert Ashley (an accountant) when they sought his advice on the tax consequences of selling a parcel of real estate. During this time, Ashley was involved with two businessmen in a plan to finance and develop machine shops. At Ashley's insistence, the Churches later invested in the shops by making two loans, totaling $61,000. In time, the Churches stopped receiving payments on the loans, and Ashley filed for bankruptcy. The Churches then filed an adversary proceeding, claiming that Ashley's debt to them was nondischargeable. At trial, finding that Ashley "knowingly induced [the Churches] to

---

[70] *Ashley v. Church (In re Ashley)*, 903 F.2d 599 (9th Cir. 1990).

make these two loans by means of false, material representations concerning the profitability and creditworthiness . . . " of the machine shops, the bankruptcy court ruled in favor of the Churches holding that their claim was nondischargeable.[71] Ashley's conduct in securing the loans, the court explained, was part of his "business plan to gain a foothold in the machine shop industry."[72]

On appeal, the Ninth Circuit affirmed, explaining that, "although slightly attenuated, Ashley's link with [the machine shops] placed him in a position to benefit from any infusion of capital to that enterprise."

> One may characterize this event in either of two ways: (a) Ashley was sufficiently closely related to [the machine shops] to be considered a recipient of the $61,000 loan; or (b) although not a recipient of the $61,000, Ashley did profit because he had a financial interest in [the machine shops]. On either theory, Ashley obtained "money, property, services . . . or . . . credit" for himself.[73]

Dr. DeMasi's situation is in no real way different from Ashley's. Ashley lied to the Churches in order to convince them to make loans to the machine shops because he stood to gain from them doing so. Similarly, Dr. DeMasi injected capital into SSI in favor of advancing his personal interests. What is different is that Dr. DeMasi had to convince no one to make this happen. As medical director, he simply did it on his own accord. As the Ninth Circuit would put it, there are two ways to characterize Dr. DeMasi's calculated decision to prematurely pay SSI in full: (a) Dr. DeMasi was so closely tied to SSI, that he in effect received the $100,000 payment, or (b) although he was not a recipient of the payment, he profited because his personal interests

---

[71] *Id.* at 602.

[72] *Id.* at 604.

[73] *Id.* at 604 n.5.

were so dependent upon SSI's financial success. Either way, deciding to advance SSI $100,000 "was indeed obtaining something for himself."[74]

The fact that SSI was entitled to collect the $100,000 in time is immaterial to this analysis. Had Dr. DeMasi been focused only on the Plaintiff's interests, he would not have paid SSI the full management fee in the manner that he did. To suggest otherwise denies reality.

(c)  The potential for financial gain was a benefit to Dr. DeMasi

Perhaps the greatest benefit that Dr. DeMasi realized, however, was the potential for significant financial gain had SSE succeeded. In Dr. DeMasi's own words, for each surgery center that SSE acquired or developed, he was set to earn a greater stock interest in SSE or an equity interest in the surgery center itself. On top of that, SSI promised to pay him an outright $25,000 consulting fee for each successful deal. Dr. DeMasi argues that this mere opportunity to profit from SSE's expected growth is not "a benefit" sufficient to satisfy the "receipt of benefits" test. This is incorrect, and other debtors have been equally unsuccessful in making this argument.

In *In re Goodwich*,[75] Walter Goodwich, an accountant, convinced his long-time friend and client, Murray Kovens, to invest in a Jimmy Buffett concert that Charm City Productions was putting together.[76] Goodwich personally guaranteed repayment of Kovens' investment. Charm City and Kovens were each set to collect 40% of the profits; Goodwich was entitled to the remaining 20%. As it turned out, the concert was never truly set to take place, and Kovens lost a substantial portion of his investment.[77] Goodwich later filed for bankruptcy protection, and Kovens in turn filed an adversary proceeding under § 523(a)(2)(A). At trial, it was not apparent

---

[74] *Id.* at 604.

[75] *Kovens v. Goodwich (In re Goodwich)*, 517 B.R. 572 (Bankr. D. Md. 2014).

[76] *Id.* at 577-578.

[77] *Id.* at 578-581.

whether Goodwich knew that the concert was a sham when he induced Kovens into investing in the project.[78] It was clear, however, that Goodwich knowingly made other misrepresentations regarding past profits that he had earned from other Charm City concerts, which Kovens directly relied upon.[79] On these facts, the bankruptcy court considered whether Goodwich was entitled to a discharge of the Kovens' claim.

Citing *In re Bilzerian* and applying the "receipt of benefits" test, the court found for Kovens.[80] "As a result of his actions, Goodwich received a direct benefit—namely, [an agreement] under which he expected to receive 20% of the profits from the Jimmy Buffett concert."[81] "That those profits were (unknown to Goodwich) illusory is immaterial."[82] Had the promoters been "legitimate but ineffective" and thus unable to repay Kovens the full loan amount, the court explained, Goodwich would have been in the same position—on the hook for the balance of the debt.[83] Either way you cut it, Goodwich fraudulently convinced Kovens to make a bad bet. And he "should not be in a better legal position merely because he made misrepresentations about his profits on an investment with someone who proved to be a dishonest promoter rather than simply an innocently unprofitable one."[84]

---

[78] *Id.* at 580.

[79] *Id.* at 579.

[80] *Id.* at 587, 592.

[81] *Id.* at 588.

[82] *Id.*

[83] *Id.*

[84] *Id.*

*In re Cramblitt* demonstrates the same point.[85] In an effort to secure a line of credit for Griffith Transportation from Hale, Trailer, Brake & Wheel, Inc. ("Hale"), Thomas Cramblitt represented himself to Hale as Griffith Transportation's CEO. Hale eventually agreed to extend Griffith Transportation a loan, but only after Cramblitt personally guaranteed the loan. Griffith Transportation and Cramblitt eventually defaulted on the loan, and Cramblitt filed for bankruptcy protection. Hale later filed an action under § 523(a)(2)(A).[86] At trial, Cramblitt's motivation for defrauding Hale became clear: Cramblitt had previously loaned Griffith Transportation $20,000, but Griffith Transportation had not yet repaid him.[87] In addition, Cramblitt was covered under Griffith's Transportation's employer-funded health insurance plan.[88] Accordingly, Cramblitt had a significant interest in Griffith Transportation staying in business and continuing to generate revenues.[89]

At trial, Cramblitt argued that he had not received a benefit and was entitled to a discharge of the Hale claim.[90] The court rejected this argument, noting that he had received two benefits as a result of his fraud: the prospect of recovering the loan amount and health insurance coverage. Even though ultimately Griffith Transportation could not or did not repay Cramblitt's loan to Griffith Transportation, the inescapable conclusion was that such benefits did flow to Cramblitt as the result of his fraud. "Section 523(a)(2)(A) provides that a debt for credit obtained

---

[85] *Hale, Trailer, Brake & Wheel, Inc. v. Cramblitt (In re Cramblitt)*, No. 09-20324DK, 2010 WL 3245387, at *1 (Bankr. D. Md. Aug. 17, 2010).

[86] *Id.*

[87] *Id.* at *2.

[88] *Id.*

[89] *Id.* at *5.

[90] *Id.* at *2.

by fraud is not dischargeable in a Chapter 7 case. The language of the statute contains no words requiring that the debtor must have profited to the extent the debtor may have anticipated when the fraudulent misrepresentation was made."[91]

Like Goodwich, Dr. DeMasi's fraudulent behavior was driven by an agreement under which he was set to realize significant financial gain (no less than $25,000 per deal). Like Cramblitt, Dr. DeMasi defrauded one business for the good of another, but forever failed to earn the personal profits that he pursued. Like Goodwich and Cramblitt, Dr. DeMasi now suggests that he received nothing at all. As the courts above thoroughly explained, accepting this argument would be to defy logic and to reward the failed cheat over the successful one. Section 523(a)(2)(A) does neither. To put it simply, fraudulent activity in the name of furthering a business expectancy—whether or not the expectancy is ever realized—is benefit enough under § 523(a)(2)(A).

### (d) *In re Rountree* does not support Dr. DeMasi's argument

Dr. DeMasi relies on the Fourth Circuit's decision in *In re Rountree*[92] in support of his argument that he did not receive a benefit. This reliance is misplaced. The factual background of the case started in 1991 when Pamela Nunnery was involved in automobile accident with another motorist.[93] She sued for personal injury. In preparing the defense of the state court case, the motorist's insurance company hired a private investigator, June Rountree, to gather information about Nunnery.[94] Rountree befriended Nunnery and eventually convinced Nunnery to join her

---

[91] *Id.*

[92] *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215 (4th Cir. 2007).

[93] *Id.* at 217.

[94] *Id.*

water skiing, horseback riding, and on rides at the amusement park.[95] Rountree videotaped these events and later turned the footage over to the insurance company.[96] Following litigation with the insurance company, Nunnery sued Rountree in state court for fraud. Rountree later filed for bankruptcy, and Nunnery filed a nondischargeability proceeding under § 523(a)(2)(A).

Reviewing § 523 in whole, the court of appeals noted that because § 523(a)(6) protects creditors against a debtor's "willful and malicious" injury to the creditor or her property, "[i]t would be unnecessary for subsection (a)(2)(A) also to provide relief for judgment creditors injured in tort."[97] Rather, the language of the statute "makes clear that Congress intended § 523(a)(2) to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means."[98] Throughout, neither party disputed the fraud underlying the state court judgment, nor the fact that Rountree obtained nothing from Nunnery *as a result* of the fraud.[99] Accordingly, the court of appeals concluded that Nunnery could not prevail and affirmed the district court's judgment.[100] Although "Rountree's fraud may have injured her," the court explained, "Rountree did not commit the fraud in order to obtain anything in the sense contemplated by § 523(a)(2)."[101]

In arguing that the Fourth Circuit's above decision "is particularly instructive" to the present case, Dr. DeMasi misunderstands the court's opinion. *In re Rountree* considers a

---

[95] *Id.* at 217-218.

[96] *Id.* at 218.

[97] *Id.* at 219.

[98] *Id.* at 219-220.

[99] *Id.* at 222.

[100] *Id.* at 222-223.

[101] *Id.* at 220.

structural aspect of § 523(a)(2)(A)—"whether the law requires that the debtor have fraudulently

obtained something from the creditor or that the debtor simply have engaged in fraud that results

in a debt owed to the creditor."[102] It does not at all touch on the issue before this Court—whether

someone in a similar position to Dr. DeMasi gained "a *benefit* from the money that was obtained

by fraudulent means." But more than that, Dr. DeMasi's argument that *In re Rountree* is

instructive is dependent upon a finding that he did not benefit as a result of his fraud. For

obvious reasons then, it is really no help at all. If Dr. DeMasi had in fact received nothing, there

would be little reason to consider Fourth Circuit case law.

### Conclusion

Section 523(a)(2)(A) denies debtors a discharge for money, property, services, or credit

obtained by fraud. Here, the State Court previously determined that Dr. DeMasi defrauded the

Plaintiff. Because the State Court's judgment establishes that all elements of § 523(a)(2)(A) are

satisfied and because it is entitled to preclusive effect under Florida's collateral estoppel

doctrine, Dr. DeMasi's liability to the Plaintiff is nondischargeable. The Plaintiff is therefore

entitled to summary judgment.

Accordingly, it is

**ORDERED:**

1.      The Motion for Summary judgment (Doc. No. 12) filed by the Plaintiff is granted.

2.      The Cross Motion for Summary Judgment (Doc. No. 47) filed by the Defendant is

denied.

3.      The claim arising under the Amended Final Judgment Awarding Damages entered

by the State Court on December 7, 2012, as subsequently amended to the amount of

---

[102] *Id.*

$205,714.47, plus any post-judgment interest accruing thereon, is hereby determined to be nondischargeable.

      4.     The Court will retain jurisdiction to make a determination of the amount of any costs to which the Plaintiff is entitled under applicable nonbankruptcy law.

      5.     The Court will enter a separate final judgment determining Plaintiff's claim as set forth in decretal paragraph 3, above, to be nondischargeable.  Said separate final judgment, not this Order, will be a final order from which an appeal can be taken.

Attorney Zala L. Forizs is directed to serve a copy of this order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the order.

Zala L. Forizs, Esq.
McIntyre, Thanasides, et al.
*Counsel for Plaintiff*

Stuart J. Levine, Esq.
Heather A. DeGrave
Walters, Levine, Klingensmith & Thomison
*Counsel for Plaintiff*

David S. Jennis
Kathleen L. DiSanto
Jennis & Bowen
*Counsel for Defendant*